1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11

UNITED STATES OF AMERICA,

12

Plaintiff,

13

v.

14

GERARDO MON GEN YIP,

15

Defendant.

CASE NO. 06cr0417 BTM

**ORDER DENYING MOTION FOR NEW TRIAL**

16
17

Defendant Mon Gen Yip has filed a Motion for New Trial.  For the reasons discussed below, Defendant's motion is **DENIED**.

18
19
20

## I.  BACKGROUND

21

On February 4, 2006, at approximately 7:00 p.m., Defendant, the driver and sole occupant of a 2000 Ford Taurus, entered the San Ysidro Port of Entry.  Defendant was referred to secondary inspection when a narcotic detector dog alerted to the trunk of Defendant's car.  At secondary inspection, Customs and Border Protection officers discovered several packages hidden in a non-factory compartment.  The packages tested positive for cocaine.

22
23
24
25
26

In an Indictment filed on March 1, 2006, Defendant was charged with importation of 16.3 kilograms of cocaine in violation of 21 U.S.C. §§ 952 and 960 and possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1).

27
28

06cr0417 BTM

1    Prior to trial, the Government filed a motion in limine to admit Rule 404(b) evidence
2  of Defendant's  post-arrest statements to Immigration and Customs Service agents that he
3  had used methamphetamine earlier that day and over the past three days.  The Court denied
4  the motion in limine and precluded the Government from introducing evidence of Defendant's
5  admitted methamphetamine use.

6    On February 13, 2007, the second day of trial, Assistant United States Attorney
7  Neville Hedley called Special Agent Curtis Johnson to the stand.  Agent Johnson testified
8  that he and Agent Azzerello were called down to the San Ysidro Port of Entry about 9:00
9  p.m. on February 4, 2006. (Trial Transcript, 101.)  Agents Johnson and Azzerello first came
10 into contact with Defendant in a holding cell. (Trial Transcript, 103.)  After determining that
11 a translator was not necessary, the agents transferred him to an interview room.  (Id.)

12   Agent Johnson testified that after Defendant waived his <u>Miranda</u> rights, he told them
13 how the car he was driving had been loaned to him by a man named Jose or Chacho.  (Trial
14 Transcript, 106.)  Defendant told the agents that he drove the car to the United States on
15 Friday and then came back to Mexico on Saturday morning to "go party" with Jose in Tijuana.
16 (Id.)

17   At this point in Johnson's testimony, Hedley asked Johnson: "And what did he say
18 after he drove back into Mexico on Saturday morning, February 4th, 2006?" (Trial Transcript,
19 107.)  Agent Johnson responded: "He said he came back in the morning to party and that he
20 had used methamphetamine about eleven o'clock that morning, and then – ."  (Id.)

21   Defense counsel requested a sidebar and moved for a mistrial. (Trial Transcript, 107.)
22 The Court declined to grant a mistrial at that point in time, but instructed the jury to disregard
23 Agent Johnson's testimony regarding Defendant's use of a controlled substance.  (Id. at
24 110.)  Trial proceeded, and Defendant took the stand.  Defendant's drug use was not placed
25 at issue.

26   On February 15, 2007, the Court held an evidentiary hearing regarding Agent
27 Johnson's violation of the Court's order precluding the evidence regarding Defendant's drug
28 use.  Johnson testified that a few days prior to his testimony at trial, Hedley instructed him

1    that he was not to bring up Defendant's drug use.  (Transcript of 2/15/07 hearing, 17.)  He

2    had also been told not to bring up the issue of Defendant's drug use during prior trial

3    preparation.  (Id. at 18.)  Johnson explained that he inadvertently mentioned the drug use

4    because he was reciting what Defendant had told him in sequence.  (Id. at 22.)  Johnson also

5    testified that he believed Defendant told them about his drug use before the Miranda

6    warnings based on where in his notes the reference to the drug use appears.  (Id. at 13.)

7    Johnson testified that he didn't recall if Defendant reiterated his statements about his drug

8    use after the Miranda warnings, but suspects he may have.  (Id.)

9         The Court found that Hedley had told Johnson not to mention Defendant's drug use

10   and that Johnson inadvertently revealed the information.    (Id. at 31-32.)   The Court

11   concluded that there was no intentional misconduct.  (Id. at 33.)  The Court explained that

12   it was still denying a mistrial on the ground that it was more probable than not that the

13   erroneous admission of the evidence did not affect the jury's verdict.   (Id. at 37-38.)

14   However, the Court also explained that if there was a constitutional violation – i.e., if

15   Defendant's statements about his drug use were obtained in violation of Miranda – the

16   applicable test would be whether the erroneous admission of the evidence was harmless

17   beyond a reasonable doubt.  (Id. at 38.)  Because the Miranda issue was not the subject of

18   the hearing and was not addressed by the parties, the Court made it clear that it was not

19   ruling on the issue and was not ruling on whether the admission of the evidence was

20   harmless beyond a reasonable doubt.  (Id. at 38-39.)

21        On the same day as the evidentiary hearing, the jury returned a verdict of guilty on

22   both counts.  Subsequently, Defendant filed his motion for new trial.

23

24                              **II.  DISCUSSION**

25        In his Motion for New Trial, Defendant contends that his statements regarding his use

26   of drugs were obtained in violation of Miranda and his Fifth Amendment rights.  Defendant

27   further contends that the erroneous admission of this evidence was prejudicial and was not

28   harmless beyond a reasonable doubt.  However, the Court finds that Defendant made post-

1   <u>Miranda</u> statements regarding his drug use that were voluntary and admissible.  Although

2   the jury should not have heard this evidence due to the Court's ruling on the Government's

3   motion in limine, it is more probable than not that the introduction of this evidence did not

4   affect the jury's verdict.

5

6   A.      <u>Defendant's Post-Miranda Statements Regarding Drug Use</u>

7           Based on his notes, Agent Johnson believed that Defendant told him that he had used

8   methamphetamine prior to receiving the <u>Miranda</u> warnings.  According to Johnson, the

9   agents obtained biographical information from Defendant prior to reading him his <u>Miranda</u>

10  warnings. (Trial Transcript, 105.) Johnson filled out a form with the biographical information.

11  (Exh. B to Gov't Opp.)  In the space next to "Drug/Alc. use," Johnson wrote, "crystal meth

12  snort about 11 am."  Thus, it appears that Defendant admitted to using methamphetamine

13  prior to receiving the <u>Miranda</u> warnings.

14          However, the evidence shows that Defendant also admitted to using

15  methamphetamine after receiving the <u>Miranda</u> warnings.  Agent Azzarello took notes of the

16  substantive portion of Defendant's interrogation.  (Exh. C to Gov't Opp.)  Azzarello's notes

17  begin with the notation:  "rights waived."  The notes summarize Defendant's version of

18  events.  After quoting Defendant insisting, "For reals I didn't know there was cocaine," the

19  notes state: "used meth approx 11:00 am & has used the last 3 days."  This description of

20  Defendant's drug use is more complete than the notation on the biographical information

21  sheet, supporting the conclusion that Defendant talked about his drug use twice - once

22  before the <u>Miranda</u> warning and once after.

23

24  B.      <u>Law Governing Admissibility of Statements Obtained After a Miranda Warning but</u>
           <u>Preceded by the Defendant's Unwarned Incriminating Statements</u>

25

26          In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), Elstad, a burglary suspect, was at home

    when police officers arrived with a warrant for his arrest.  Elstad was questioned by a police

27
    officer who did not give him a <u>Miranda</u> warning.  Elstad proceeded to make some

28
    incriminating statements to the police officer.  Subsequently, Elstad was taken to Sherriff's

                                                 4

1   headquarters where he was read his <u>Miranda</u> rights.  Elstad indicated that he understood his

2   rights but  wanted to speak with the officers.  Elstad then made a full confession.  Elstad

3   conceded that the officers made no threats or promises either at his house or at the Sheriff's

4   station.

5       Elstad argued that his confession should have been suppressed as the "tainted fruit

6   of the poisonous tree" of the <u>Miranda</u> violation.  <u>Id.</u> at 303.  Elstad also argued that a

7   confession cannot be truly voluntary once the "cat is out of the bag."  <u>Id.</u> at 304.  The

8   Supreme Court rejected both of these arguments, reasoning:

9       It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to
        administer the warnings, unaccompanied by any actual coercion or other
10      circumstances calculated to undermine the suspect's ability to exercise his free
        will, so taints the investigatory process that a subsequent voluntary and
11      informed waiver is ineffective for some indeterminate period. Though <u>Miranda</u>
        requires that the unwarned admission must be suppressed, the admissibility
12      of any subsequent statement should turn in these circumstances solely on
        whether it is knowingly and voluntarily made.

13  <u>Id.</u> at 309.  The Court held that "a suspect who has once responded to unwarned yet

14  uncoercive questioning is not thereby disabled from waiving his rights and confessing after

15  he has been given the requisite <u>Miranda</u> warnings."  <u>Id.</u> at 318.  "The relevant inquiry is

16  whether, in fact, the second statement was also voluntarily made."  <u>Id.</u>

17      In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), the Supreme Court considered the

18  admissibility of a confession obtained through the use of a so-called "two-step" interrogation

19  strategy.   Under the two-step strategy, the police employed a "protocol for custodial

20  interrogation that calls for giving no warnings of the rights to silence and counsel until

21  interrogation has produced a confession."  <u>Id.</u> at 604.  There, the police, suspecting Seibert

22  of murder, woke her up at 3:00 a.m. and took her to the police station.  Once at the station,

23  the police questioned her for 30 to 40 minutes without providing <u>Miranda</u> warnings.  After she

24  admitted to plotting to intentionally start a fire designed to kill, Seibert was given a 20-minute

25  coffee and cigarette break.  She was then provided <u>Miranda</u> warnings and waived her rights.

26  The officer resumed questioning her, confronting her with her pre-warning statements.  She

27  confessed to the murder.  <u>Id.</u> at 604-05.  Importantly, an officer from the police department

28  that arrested Seibert testified that the department "promoted" the two-step interrogation

1    strategy.  Id. at 609.

2         Seibert moved to suppress both the prewarning and postwarning statements.  The trial

3    court suppressed the prewarning statement but admitted the post-Miranda statement.

4    Justice Souter, writing for four Justices, voted to suppress the self-incriminating statements.

5    Despite the fact these statements were made after an informed waiver of Miranda, Justice

6    Souter described the "police strategy [as] adapted to undermine the Miranda warnings."  Id.

7    at 616.  He explained that the circumstances "challeng[ed] the comprehensibility and efficacy

8    of the Miranda warnings to the point that a reasonable person in the suspect's shoes would

9    not have understood them to convey a message that she retained a choice about continuing

10   to talk."  Id. at 617.  These justices reasoned that because the "question-first tactic effectively

11   threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would

12   be admitted, and because the facts here do not reasonably support a conclusion that the

13   warnings given could have served their purpose," the post-warning statements were

14   inadmissible.  Id.

15        Justice Kennedy, concurring in the judgment, rejected Justice Souter's approach,

16   preferring "a narrower test applicable only in the infrequent case, such as we have here, in

17   which the two-step interrogation technique was used in a calculated way to undermine the

18   Miranda warning."  Id. at 622.  Justice Kennedy instead proposed that the "admissibility of

19   postwarning statements should continue to be governed by the principles of Elstad unless

20   the deliberate two-step strategy was employed."  Id.

21        In United States v. Williams, 435 F.3d 1148 (2006), the Ninth Circuit examined the

22   "splintered opinions" of  Seibert and determined that the precedential holding of Seibert is

23   that "where law enforcement officers deliberately employ a two-step interrogation to obtain

24   a confession and where separations of time and circumstance and additional curative

25   warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his

26   rights, the trial court should suppress the confession."  Id. at 1158.  However, in cases

27   "where the two-step strategy was not deliberately employed, Elstad continues to govern the

28   admissibility of postwarning statements."  Id. at 1158.

06cr0417 BTM

1    In determining whether an interrogator deliberately violated <u>Miranda</u>, courts should

2  consider whether "objective evidence and any available subjective evidence, such as an

3  officer's testimony, support an inference that the two-step interrogation procedure was used

4  to undermine the <u>Miranda</u> warning." <u>Id.</u> at 1158.  "Such objective evidence would include

5  the timing, setting, and completeness of the prewarning interrogation, the continuity of police

6  personnel and the overlapping content of the pre- and postwarning statements." <u>Id.</u> at 1159.

7  "When an interrogator has deliberately employed the two-step strategy, <u>Seibert</u> requires the

8  court then to evaluate the effectiveness of the midstream <u>Miranda</u> warning to determine

9  whether the postwarning statement is admissible." <u>Id.</u> at 1160.

10

11  C.    <u>Application of the Law</u>

12    Upon reviewing the evidence, the Court concludes that Agents Azzarello and Johnson

13  did not deliberately employ a two-step interrogation procedure to obtain incriminating

14  statements.  It is clear from the form Johnson filled out that whether the detainee was using

15  drugs or alcohol was deemed biographical information for booking purposes.  Although the

16  Court is not persuaded by the Government's position that questions about drugs or alcohol

17  *never* constitute interrogation,[1] the Court believes that the agents asked Defendant about his

18  drug use prior to <u>Miranda</u> warnings because they understood that this information was to be

19  gathered along with other background information.  There is no evidence to suggest that the

20  agents deliberately employed a two-step interrogation procedure to circumvent <u>Miranda</u>.

21    Therefore, the Court's analysis is guided by <u>Elstad</u>.  Under <u>Elstad</u>, if the prewarning

22  statements were voluntary, then the postwarning statements are admissible unless they were

23  involuntarily made despite <u>Miranda</u> warnings.

24    The Court finds that Defendant's prewarning admission that he used

25  methamphetamine was voluntary.  The pre-<u>Miranda</u> portion of Defendant's interview lasted

26  _____

27  [1] Questions that are normally deemed routine gathering of biographical data can constitute interrogation where the elicitation of the information at issue is reasonably likely to inculpate the detainee.  <u>See United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043 (9th Cir.

28  1990).  It can be argued that questions about drug use, although ordinarily routine, are reasonably likely to inculpate the detainee where the crime suspected involves drugs.

1   less than 10 minutes.  During this part of the interview, Defendant was asked a number of

2   background questions such as his address, social security number, occupation, and family

3   members.  There is no evidence to suggest that Defendant's answers to these questions,

4   including the question about his drug use, were anything but voluntary.

5        Similarly, there is no evidence that Defendant was subjected to coercive or improper

6   tactics during the post-Miranda portion of the interview.  Based on Azzarello's notes, it

7   appears that this part of the interview was also very short in duration.  After being warned of

8   his Miranda rights and agreeing to make a statement, Defendant told his version of the

9   events leading up to his arrest.  When the agents indicated that they did not believe his story,

10   Defendant responded, "I can not change the story, I don't have another story.  For reals I

11   didn't know there was cocaine." (Trial Transcript, 112; Exh. C to Gov't Opp.)  It appears that

12   the agents then ceased questioning Defendant about his version of events and asked him

13   about his drug use.  Defendant again admitted that he had used methamphetamine at

14   approximately 11:00 a.m. and added that he had used methamphetamine over the past three

15   days.  (Exh. C to Gov't Opp.)

16        There is no evidence of circumstances that undermined Defendant's ability to exercise

17   his free will during the post-Miranda portion of the interview.  To the contrary, when agents

18   suggested that Defendant was lying, Defendant  insisted that  he was telling the truth and

19   continued to proclaim his innocence.  Shortly thereafter, Defendant admitted to using

20   methamphetamine.  The Court concludes that Defendant's postwarning admission of drug

21   use was voluntary.

22        Because Defendant's postwarning statements regarding his methamphetamine use

23   were not obtained in violation of Miranda or Defendant's Fifth Amendment rights, the

24   applicable standard for determining whether the erroneous introduction of the evidence was

25   harmless is whether it is "more probable than not that the erroneous admission of the

26   evidence did not affect the jury's verdict."  United States v. Hill, 953 F.2d 452, 458 (9th Cir.

27   1991).  As the Court previously concluded, considering all of the evidence presented at trial,

28   the Court's curative instruction, and the fact that Defendant's drug use was not mentioned

1    again, it is more probable than not that the erroneous introduction of evidence regarding

2    Defendant's methamphetamine use did not affect the jury's verdict.

3

4                                    **III.  <u>CONCLUSION</u>**

5          For the reasons discussed above, Defendant's Motion for a New Trial is **DENIED**.

6

7    **IT IS SO ORDERED.**

8
     DATED:  May 10, 2007
9

10                                             Hon. Barry Ted Moskowitz
11                                             United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              9                                   06cr0417 BTM